## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRENT JACOBY, AIS # 291560,** | : | |
| **Plaintiff,** | : | |
| **vs.** | : | **CIVIL ACTION 12-366-CG-C** |
| **Mack, et al.,** | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motion for summary judgment of Plaintiff (doc. 25) and Defendants. (Docs. 40, 43-47 & 49). After careful review of the pleadings, and for the reasons set out below, it is recommended that Plaintiff's motion for summary judgment be denied; Defendants' motion for summary judgment be granted; and Plaintiff's action against all defendants be dismissed with prejudice.

## I.    Summary of Alleged Facts[1]

---

[1] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, Fla, 208 F.3d 919, 925 n.3 (11th Cir. 2000) (citations and internal quotation marks omitted); see Cottone v. Jenne, 326 F.3d 1352 n.1 (11th Cir. 2003) ("Because we must accept the allegations of plaintiffs' amended complaint as true, what we set out in this opinion as 'the facts' for Rule 12(b)(6) purposes may not be actual facts."). Nevertheless, for summary judgment purposes, the Court's analysis begins with a description of the facts in the light most favorable to the nonmoving party and disregards legal conclusions and recitations of the basic elements of a cause of action. See Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011); McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009).

1

For the time relevant to this complaint, Plaintiff was a pretrial detainee at Baldwin County Sheriff's Correctional Center ("BCSCC"). (Doc. 1). He petitioned the court alleging numerous Eighth and Fourteenth Amendment violations arising from multiple incidents and is suing several defendants, namely, Sheriff Huey Mack, Major Dale Byrne,[2] Corporal Kent Carr, Officer Joshua Keers, Officer Mark Boyington, and Officer John Rowell.[3] From its review of the record, the court summarizes the parties' allegations which are material to the issues addressed in this report and recommendation.

1.      April 7, 2012 Incident.

Plaintiff claims that on or about April 7, 2012, he was subject to a cell frisk by Defendant Boyington, Officer Harville, and Officer Quinley. (Id. at 4). Loose tobacco was found in Plaintiff's cell. (Id.). Officer Quinley charged Plaintiff with possession of contraband tobacco, and in attempt for a lesser charge and penalty, Plaintiff exchanged

---

[2]      A Suggestion of Death was filed on behalf of Defendant Major Dale Byrne. (Doc. 66). Major Milton has assumed the supervisory position and duties at BCSCC of the decedent Major Byrne. (Doc. 68). Consequently, Plaintiff has elected to substitute Major Milton, in the place of Major Byrne, as a defendant in this action. (Id.). Plaintiff requests injunctive relief against said party for the alleged "unconstitutional policies" at BCSCC that occurred under Major Byrne's supervision and authority. (Id. at 1). Despite the change in supervisors at BCSCC, Plaintiff asserts that Major Milton has not altered or eradicated any of the unconstitutional polices and practices in place under Major Byrne, and Plaintiff, therefore, seeks compensatory damages against Defendant Major Milton. (Id. at 2). For the ease of reading this report and recommendation, the court will continue to use Major Byrne's name, notwithstanding Plaintiff's substitution of said defendant, as it is used in the complaint.

The court however finds no liability on the part of Defendant Major Byrne or any defendant in the action; therefore it is irrelevant to discuss the potential liability or ability for Plaintiff to seek relief from Major Milton in his official and/or individual capacity given that he took no part in any claim made by Plaintiff.

[3]      Two defendants, Baldwin County and Sergeant Scott, were dismissed from this action pursuit to 28 U.S.C. § 1915(e)(2)(B)(i) on December 28, 2012. (Doc. 19).

information with the officers about the location of hidden contraband within the jail. (Id.; Doc. 25 at 74). A disciplinary hearing was held for the charge of contraband tobacco on April 14, 2012, where Defendants Boyington and Harville sat as two of the three hearing officers. (Doc. 25 at 74). Plaintiff was "Found Guilty by admission" and sentenced to fourteen days in segregation, the maximum sentence for the charge. (Id.).

Plaintiff filed an appeal of the hearing stating that when the tobacco was found in his cell, he "asked the officer if he told them where to find tattoo ink and needles would they give him probation and help him[?]" (Doc. 25 at 75). Plaintiff received a response that his "request [was] denied." (Id.).

2.    April 13, 2012 Incident.

On April 13, 2012, Plaintiff again informed officers of contraband, a "shank," located in the jail. (Id.). He was asked to and did retrieve the item, but upon surrendering the contraband to jail officials, Plaintiff was charged with possession of a weapon[4] and Defendants Boyington, Keers, Rowell, and Officer America transferred Plaintiff to segregated housing[5] to await his disciplinary hearing for the charge. (Id.). A narrow list of items are allowed in the segregation unit; therefore, prior to Plaintiff's personal items being brought to him in the segregation unit, officers searched Plaintiff's

---

[4]    Defendants state that Plaintiff was known to hide contraband and then turn it over in attempt to gain leniency after he was charged with a disciplinary infraction. (Docs. 43 at 8-9; 43-6 at 3). To discourage this habit, a "'zero-tolerance" policy was adopted wherein Plaintiff was always charged with a disciplinary action whenever it appeared that he was harboring contraband." (Doc. 43 at 8-9). Plaintiff was later found not guilty at the disciplinary hearing for the charge of possessing the shank. (Doc. 43 at 8-9).

[5]    The conditions of the segregated housing units are at issue in this action. Plaintiff asserts he "has suffered a significant and atypical hardship because . . . he has been forced to sleep on the floor, next to toilets with urine splattering on his mattress and sleep in pubic hairs, dirt and bugs." (Doc. 25 at 11). See *infra* pp. 28-33.

cell and removed all unapproved personal property from Plaintiff's possession while being held in segregation.  (Doc. 43-6 at 3).

Upon the realization that his legal books[6] and other pieces of personal property had been withheld from him (doc. 1 at 5-6), Plaintiff became upset and began to scream for an officer's help.  (Id.)  Defendant Rowell attempted to explain to Plaintiff why his belongings were searched and why his legal books and other articles were withheld from Plaintiff.  (Doc. 43 at 9).  Plaintiff, however, "became angry, yelling, kicking the door, and generally being very disruptive."  (Id.)  Officers commanded Plaintiff to stop his disruptive behavior and warned Plaintiff if he did not stop the yelling and kicking of his door, "he was going to the restraint chair."   Plaintiff did not obey the officers' commands to cease his disorderly conduct and Defendant Keers, Defendant Rowell, Defendant Boyington, and Officer America were authorized by Sergeant Wilson to enter Plaintiff's cell, with a camera for documentation, and use oleoresin capsicum ("OC" or "pepper") spray on Plaintiff in attempt to control the situation.  (Id.; Doc. 45-1 at 19).

When Defendants and Officer America entered Plaintiff's cell, Plaintiff "had a shirt and towel wrapped around his head and [was] holding a sheet to block the spray." (Doc. 45-1 at 19).  Plaintiff was ordered to lie down on the floor but again disobeyed officers' commands and "refused to lay down."  (Doc. 25 at 79).  After Plaintiff's refusal to lie on the floor, Defendant Rowell deployed OC spray on Plaintiff's face and torso for two seconds.  (Id.; Doc. 46-1 at 2-3).  With Plaintiff still refusing to comply with orders,

---

[6]     Defendants allege that at least one of the law books found in Plaintiff's cell belonged to the jail library, but Plaintiff states they were both among his personal belongings.  (Doc. 43-6 at 3; Doc. 46-1 at 15, 28).  Plaintiff further states his "books, drawings, cosmetics and food was [sic] missing."  (Doc. 1 at 5; Doc. 25 at 8).

another two-second spray was deployed.  (Doc. 45-1 at 19-20).  Despite the two bursts of pepper spray, Defendants Keers and Rowell still had to forcibly put Plaintiff on the floor.  (Id.).  Plaintiff was restrained with his hands behind his back and taken to the hallway closet to be decontaminated with cold water.  (Doc. 46-1 at 2-3).  "After decontamination [of the facial area], Jacoby was placed in the restraint chair and placed on 15 minute obs[ervation].  [And, the i]ncident was recorded on video camera."  (Doc. 45-1 at 19-20).  Plaintiff maintains he was retrained in the chair for eight and a half hours with pepper spray still burning on his body, that he was denied a change of clothing, denied access to the toilet causing him to urinate on himself, and received no medical attention, "despite his begging to be cleaned and let up to use the toilet."  (Doc. 1 at 6).  He further alleges he was harassed and laughed at by officers while restrained.[7] (Id. at 7).

3.      Transfer to Maximum Security Housing.

After being released from segregation, Plaintiff returned to maximum custody housing.[8]  (Doc. 1 at 13).  He contends he should be classified as and housed in medium

_____

[7]      Plaintiff states that while he was restrained in the chair he was laughed at and told to, "burn bitch," and someone else yelled out, "sue me now punk."  (Doc. 1 at 7) (emphasis omitted).

[8]      The timeline of Plaintiff's transfer from medium custody to maximum custody is unclear from Plaintiff's filings.  His complaint reads that he was transferred to maximum security after he was released from segregation for the charge of tobacco possession.  (See Doc. 1 at 13).  However, in his motion for summary judgment he states that the cell search where tobacco contraband was found was conducted in "high max," but later he states he "stayed in population until his hearing on April 14, 2012."  (Doc. 25 at 6).  Additionally, Plaintiff details that he was "housed with these violent offenders [in high max] on Feb. 22, 2012 without having any type of notice, hearing, new violent criminal charges, violent disciplinary charges and without having any violence on his criminal record.  He was taken out of medium custody after being placed in medium custody upon his arrival on Oct. 21, 2011."  (Doc. 25 at 12).  Despite Plaintiff's contradictory claims, the jail records indicate he was transferred to a maximum security

custody, not maximum custody housing, because he is pretrial detainee with non-violent charges, such as burglary and theft of property, pending against him, and alleges he was placed in maximum custody housing without due process and for retaliatory purposes. (Id). He claims the maximum custody blocks are dangerous because there is only one officer to guard approximately 140 inmates, and he fears the "high max" housing block due to his non-violent criminal status, Caucasian race, bisexuality, and smaller stature.[9] (Doc. 1 at 24; Doc. 25 at 4). Plaintiff further asserts he has been the victim of sexual advances by other inmates[10] and has been physically assaulted[11] while housed in the high max block.[12] (Doc. 1 at 12-13).

4.    May 23, 2012  Incident.

Plaintiff alleges while housed in maximum security custody, he was assaulted by two inmates on May 23, 2012. (Doc. 1 at 13). Plaintiff claims he suffered a cut from a

---

dorm on February 22, 2012. (Doc. 46-1 at 15). Therefore, the court assumes the correctness of BCSCC's transfer record, which is corroborated by Plaintiff in his motion for summary judgment.

[9]    Plaintiff contends Defendants classified him to the maximum security block because as "a small younger white male with no violence on his record[, he would suffer from the[] predators [in the maximum security unit]." (Doc. 1 at 24).

[10]    Plaintiff states that "[i]nmates pull their penises out in front of him, [l]ust over his body, [m]ake sexual advances towards him, [g]rab his butt, [m]asterbate while looking at him, and was even woke [sic] up by a man laying in his bed naked with an erection." (Doc. 1 at 12; See also Doc. 25 at 13).

[11]    On or about May 23, 2012, Plaintiff states he was cut and assaulted by two inmates for not giving up his food; he received medical treatment for the injuries. (Doc. 1 at 13). However, after investigation by BCSCC and disciplinary hearings, this incident was never proven to have occurred.  (Doc. 43 at 5-6; see also, *infra* n. 22 and accompanying text).

[12]    Plaintiff was reclassified and returned to general population on June 16, 2012, following his ability to achieve several weeks without having disciplinary actions taken against him. (Doc. 43-3 at 4; Doc. 25 at 2).

razor blade on his cheek and arm from the assault.  (Doc. 25 at 13; Doc. 45-1 at 31-32).

He states he tried to conceal the injury, "but after about 4 hours of bleeding he reported it to the staff and got stitches."  (Doc. 25 at 13).  Upon an officer's knowledge of the attack, the alleged assailants were charged with assault and transferred to another housing block pending their disciplinary hearing for the charge.  (Doc. 45-1 at 31-32).

Also following the alleged assault, Plaintiff filed a grievance requesting a transfer from maximum security housing to medium security housing where he had no known enemies.  (Doc. 44-1 at 37).  His request to move to medium custody was denied, but Defendant Byrne responded that he would transfer Plaintiff to a cell where he would be "safe from [] known enemies.  (Id.; Doc. 25 at 14).  Thereafter, Plaintiff was moved to administrative custody for his protection.  (Doc 25 at 101, 103).

## II.     Procedural Background

Plaintiff filed this lawsuit on May 31, 2012, claiming constitutional violations of (1) excessive use of force, (2) due process violations, (3) unsafe housing environment, (4) segregated housing conditions, (5) failure to protect, (6) retaliation, (7) failure to train and supervise against Defendants in their official and individual capacities.  (Doc. 1 at 15-26).  Before Defendants answered Plaintiff's complaint, Plaintiff filed a motion for summary judgment.  (Doc. 25).   Defendants subsequently answered the suit and filed a special report (docs. 40; 43-47; 57) to which Plaintiff responded.  (Doc. 51).  Defendants' answer and special report were converted to a motion for summary judgment on February 4, 2014.  (Doc. 69).  The court ordered that Plaintiff inform the court in writing if he desired to continue the litigation, to notify the court of any pending requests or motions Plaintiff had filed that had not been ruled on, and to submit any information or evidence in opposition to Defendants' motion for summary judgment on or before

March 3, 2014.  (Id.).  On March 4, 2014, following the passing of the set deadline, the

court took the action under submission.  (Id.).  On March 7, 2014,[13] the court received

Plaintiff's letter stating he wished to proceed with the action and "has no more further

documents to submit at this time" (Doc. 70), is considered his acknowledgment that the

pending motions are now ripe for consideration. Plaintiff's Complaint, as amended,

seeks injunctive relief to discontinue the unconstitutional practices alleged in his

complaint, as well as compensatory, punitive, and nominal damages for his injuries,

including psychological abuse and pain.  (Doc. 1 at 28; Doc. 25 at 29; Doc. 51 at 24).

## II.    Standard of Review

In analyzing the propriety of a motion for summary judgment, the Court begins

with these basic principles.  The Federal Rules of Civil Procedure grant this Court

authority under Rule 56 to render "judgment as a matter of law" to a party who moves

for summary judgment.  Federal Rule of Civil Procedure 56(a) provides that "[t]he court

shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  In

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), the Supreme Court held that summary

judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact. . . ."  However, all of the evidence and factual inferences

reasonably drawn from the evidence must be viewed in the light most favorable to the

nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson v.

---

[13]     Plaintiff's letter is dated March 2, 2014 and stamped by the U.S. postal service on
March 5, 2014.   Applying the "mailbox rule," the court accepts Plaintiff's date of filing
as the date he delivered the letter to prison authorities for mailing, Houston v. Lack, 487
U.S. 266, 275 (1988), and assumes Plaintiff delivered the letter to prison officials the
same day he signed it.

BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-25.

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. See Stabler v. Fla. Van Lines, Inc., No. 11-0103-WS-N, 2012 WL 32660, *5 (S.D. Ala. Jan. 6, 2012) (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)). Summary judgment is proper when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted). "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." AGSouth Genetics, LLC v. Cunningham, No. 09-745-C, 2011 WL 1833016, *2 (S.D. Ala.

May 13, 2011).

**III. Analysis**

As a pretrial detainee, Plaintiff is protected under the Due Process Clause of the Fourteenth Amendment.  See Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983).  In this Circuit, however, it has been held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment to convicted persons." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (quoting Hamm v. DeKalb Cnty., 774 F.2d 1567, 1574 (11th Cir. 1985)); cf. Hare v. City of Corinth, 74 F.3d 633, 649 (5th Cir. 1996) ("That pretrial detainees may have more protections or rights in general, however, does not mean that they are entitled to greater protection of rights shared in common with convicted inmates."). Accordingly, the court will utilize Eighth Amendment analysis in addressing Plaintiff's § 1983 claims.

A.    Defendants' Immunity from Suit

1.    Eleventh Amendment Immunity

With respect to Plaintiff's claims against defendants in their official capacities, the individual defendants contend that they are entitled to Eleventh Amendment immunity as state officials.  It is well-established that "suits against an official in his or her official capacity are suits against the entity the individual represents."  Parker v. Williams, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989); see also Monell v. Dep't of Soc. Serv. of City of N.Y., 436 U.S. 658, 690 n.55, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978) (indicating that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"); Welch v. Laney, 57 F.3d 1004, 1007

(11th Cir. 1995); <u>Farred v. Hicks</u>, 915 F.2d 1530, 1532 (11th Cir. 1990). The determination

of the entity which the officials represent is determined by reference to state law.  <u>See</u>

<u>Welch</u>, 57 F.3d at 1008.  As a matter of Alabama law, Sheriff Mack is a state officer

within the executive department of state government. <u>See</u> <u>Parker v. Amerson</u>, 519 So. 2d

442, 443 (Ala. 1987).  Likewise, a sheriff's deputies, such as Officers Byrne, Boyington,

Carr, Keers, and Rowell, are legally an extension of the sheriff, and their acts are

considered those of the sheriff. <u>See</u> <u>Mosely v. Kennedy</u>, 245 Ala. 448, 17 So. 2d 536, 537

(1944).  Accordingly, all defendants in this action are state officials for the purposes of

immunity from suit. <u>See</u> <u>Welch</u>, 57 F.3d at 1008; <u>Carr v. City of Florence, Ala.</u>, 916 F.2d

1521, 1525 (11th Cir. 1990).

As such, Plaintiff's claims against the individual defendants in their official

capacities are effectively claims against the State of Alabama.  The Supreme Court has

held that states and state officials are not "persons" subject to liability under 42 U.S.C. §

1983.  <u>See</u> <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58 (1989).  Moreover, pursuant to

the Eleventh Amendment to the U.S. Constitution, its own citizens may not sue a state

unless the state consents to suit or Congress acts to abrogate immunity.  <u>See</u> <u>Carr</u>, 916

F.2d at 1524-25.  Neither has happened in this case.  Therefore, the individual

Defendants enjoy absolute immunity from the damages claims raised against them by

Plaintiff in their official capacities.

     2.    <u>Qualified Immunity</u>

All defendants in this action have invoked the defense of qualified immunity for

the claims asserted against them in their individual capacities.  "Qualified immunity

insulates government actors, in their individual capacities, from civil lawsuits as long as

the challenged discretionary conduct does not violate clearly established federal

statutory or constitutional rights." <u>Adams v. Poag</u>, 61 F.3d 1537, 1542 (11th Cir. 1995); <u>see also</u> <u>Belcher v. City of Foley, Ala.,</u> 30 F.3d 1390, 1395 (11th Cir. 1994). There can be no dispute that all officers were acting within their discretionary authority at all times when the acts in question occurred. Therefore, Defendants are entitled to qualified immunity unless Plaintiff can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. <u>See</u> <u>Belcher</u>, 30 F.3d at 1395; <u>Evans v. Hightower</u>, 117 F.3d 1318, 1320 (11th Cir. 1997). "General propositions and abstractions do not qualify for bright line, clearly established law. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." <u>Wilson v. Blankenship</u>, 163 F.3d 1284, 1288 (11th Cir. Ala. 1998) (internal citations omitted). Therefore, the court will now address whether or not there has been a violation of any constitutional right; if not, Defendants are entitled to qualified immunity and summary judgment should be granted.

B.  <u>Excessive Use of Force</u>

To establish a constitutional violation for excessive use of force, Plaintiff must first show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation, meaning defendants' conduct "shocks the conscience," <u>Lumley v. City of Dade City, Fla</u>., 327 F.3d 1186, 1196 (11th Cir. 2003), and, second, Plaintiff must show that "the officials act[ed] with a sufficiently culpable state of mind," *i.e.*, that they acted "maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S.

1, 6-8 (1992). "Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). The factors used to determine whether there has been a violation of the Eighth Amendment in the prison security context are: the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts to temper the severity of a forceful response, and the extent of injury suffered. Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321).

Plaintiff claims that Defendants Rowell and Keers inflicted cruel and unusual punishment upon him in violation of the Eighth Amendment when they sprayed him with OC spray and thereafter restrained him in a chair, that Defendant Boyington failed to intervene, and Defendants Mack and Byrne failed to protect him by having in place policies that allowed for excessive uses of force by BCSCC officers. The record shows, and Plaintiff admits, that just prior to the incident at issue, Plaintiff was upset, yelling, screaming, and demanding an officer's help after realizing some of his personal items had been removed from his possession for the duration of his housing in segregation. Defendants warned Plaintiff that if he did not cease the disruption he would be put in a restraint chair, and Plaintiff admits refusing to comply with officers' orders upon their entering his cell. (Doc. 25 at 79). There is no question that given Plaintiff's recalcitrant behavior, the initial use of force, the OC spray, was reasonable and used in a good faith effort to maintain or restore discipline. See Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008) overruled on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010) (finding "pepper spray is an accepted non-lethal means of controlling unruly inmates").

Furthermore, the court finds no constitutional violation with the subsequent use of the restraint chair, especially given that Plaintiff admits he was warned he would be placed in the restraint chair if he did not obey the orders of the officers and stop yelling and kicking.  (Doc. 25 at 79).  Courts recognize that corrections officials often must make decisions "'in haste, under pressure, and frequently without the luxury of a second chance.'"  Hudson, 503 U.S. at 6 (citing Whitley, 475 U.S. at 320).  Moreover, an inmate "is not at liberty to ignore or disobey, without consequence, the lawful orders of his custodians or the rules and regulations of a jail."  West v. Sconyers, 2010 WL 4822084, *7 (M.D. Ala. 2010) (unpublished).  "Strict adherence to rules and orders within a penal institution's walls are necessary for discipline, and even more importantly, for the safety and security of inmates, guards, and visitors alike."  Id.   The record shows that Plaintiff was disruptive, would not heed verbal commands to stop yelling, screaming and kicking his door.  Therefore, it was the discretionary judgment of the officers on scene to restrain Plaintiff.  Also, in addition to the disruption Plaintiff was causing because, as he admits, he was upset that his personal belongings were withheld, Defendants may have been concerned for Plaintiff's safety, as he has a history of suicide attempts when he is upset.  (See Doc. 25 at 86; see also, Jacoby v. Baldwin County, CA No. 12-0197, WS-M, 2013 U.S. Dist. LEXIS 72212 (S.D. Ala. May 7, 2013); Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010) (courts may take judicial notice of documents in plaintiff's prior cases).  Therefore, placing Plaintiff in the restraint chair where he could be observed until he was subdued and no longer agitated was potentially safer not only for the officers and other inmates but for Plaintiff himself.

The complaint further alleges that Plaintiff was held in the restraint chair for eight hours without being decontaminated, receiving clean clothing, or being allowed to

use the toilet. This accusation causes more concern for the court, but after a thorough review of the pleaded facts and the record presented by the parties, the court determines Plaintiff was not restrained "maliciously and sadistically to cause harm," the restraint does not shock the conscience, and no constitutional violation occurred.

Plaintiff's behavior prior to and during the incident in question evidenced resistance, aggression, and belligerence toward Defendants. Defendants did not use force against Plaintiff unprovoked or without justification. Defendants initially verbally ordered Plaintiff stop yelling, screaming, and kicking in his cell because he was upset about not having all of his possessions. Plaintiff refused to obey these requests to stop being disruptive. He was thereafter warned if he continued his behavior "he was going to the restraint chair." (Doc. 25 at 79). Plaintiff then failed to acquiesce to the officers when they entered his cell and even after two deployments of OC spray. Furthermore, Plaintiff admits he continued to be disorderly *while he was restrained* in the chair by yelling at the officers and begging to be released and cleaned up. (Doc. 1 at 6). The defiant and hysterical behavior evidenced by Plaintiff's actions necessitated corresponding force by officers to maintain and restore control and discipline to the situation. Moreover, and important to the <u>Whitley</u> factors when determining whether or not force was legitimately used in a custodial setting, is the fact that Plaintiff sustained no injury or actual damage from the incident.

Plaintiff fails to plead or prove any physical injury from being restrained in the chair for eight hours. Plaintiff articulates one effect from the force used on him – burning. This sole complaint of burning is the usual physical response to exposure to pepper spray, which was used in a good faith effort to restore discipline in this case. In the instant action, Plaintiff would appear to not have suffered even the typical amount

of burning from the spray as the record shows Plaintiff's head was covered with a shirt and towel and he was holding a sheet in front of him at the time OC spray was deployed at him.  (Doc. 45-1 at 19).  These extra linens would have provided a shield blocking much of the OC spray from making contact with Plaintiff's skin and would surely have lessened the characteristic symptoms felt from OC spray.  Also, the fact that Plaintiff's body was clothed at the time OC spray was deployed would diminish the severity of the effects OC spray would have had, as research shows that OC spray does not persist on clothing or affected areas.[14]  Furthermore, Plaintiff fails to allege that he needed or sought medical treatment following the incident, nor does he state details of when his symptom of burning ceased or identify a lasting effect from the spray or restraint chair.  Therefore, the court finds the burning discomfort felt by Plaintiff while restrained was temporary (and likely less severe than an "uncovered" victim would experience), and is not objectively harmful enough as to establish a constitutional violation because it does not "shock the conscience."  Lumley, 327 F.3d at 1196.

Beyond the allegation of burning while being held in the restraint chair because he was not allowed to change his clothing, Plaintiff also claims he urinated on himself because he was not allowed to use the restroom while restrained for over eight hours.

---

[14]     Moreover, research shows that "OC [spray] will not persist on clothing or affected areas."  National Institute of Justice, Evaluation of Pepper Spray, February 1997, available at https://www.ncjrs.gov/txtfiles/162358.txt.  Also, OC spray requires "[n]o special decontamination protocols . . . because it is biodegradable . . . Unlike [other] irritants, OC will not persist on clothing or affected areas. . . . Finally, OC use does not result in dermatitis, skin depigmentation, or burns."  George Gkeneralis, Health Consequences of Large Scale Use of Tear Gases and Other Chemical Substances in Mass Gatherings as a Means for Law Enforcement, 7 (2012), http:crisis.med.uoa.gr/elibrary/6.pdf.  These finding support the conclusion that Plaintiff did not in fact suffer any long term effects from being placed in the restraint chair without a full body decontamination after the usage of OC spray on his face and torso.

However, Plaintiff fails to show the existence of a genuine dispute for trial on this issue. Based on the facts presented by the parties, it is undisputed that Plaintiff continued to be disruptive, including yelling at officers, while retrained in the chair. (See Doc. 51 at 13 where Plaintiff states he "screamed and burned for 8 ½ hours, urinated on himself and was forced to deal with it without clothes being changed."). Plaintiff's persistent hostile behavior while restrained in the chair, reasonably justifies Defendants not releasing Plaintiff sooner or releasing him to go to the restroom. The recalcitrant screaming by Plaintiff could easily establish a perceived threat of harm that would necessitate the continued restraint of Plaintiff. Plaintiff presents no evidence to show that he ever calmed down, acquiesced, or obeyed the officers for a period of time prior to requesting release from the chair to use the bathroom. The record presented by both parties is that Plaintiff continued to be disruptive while restrained; therefore, given the parties' agreement of the facts on this issue, there is no not sufficient evidence favoring Plaintiff for a jury to return a verdict for him, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986). The record shows that Defendants' actions were made "in a good faith effort to . . . restore discipline," not maliciously to cause harm to Plaintiff. <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21 (1986); Defendants used necessary force to subdue an inmate who would not obey their commands. <u>See Scroggins v. Davis,</u> 346 F. App'x 504 (11th Cir. 2009) (finding no constitutional violation where inmate was sprayed with OC spray, held in four-point restraints for over three hours, and then placed in a small holding cell without being decontaminated because there was no evidence of a serious risk of harm); <u>Williams v. Burton</u>, 943 F.2d 1572 (11th Cir. 1991) (finding no constitutional violation where inmate was gagged and restrained, even after being subdued, for over 28 hours because of deference to prison officials, inmate's past

behavior, and attention given to inmate during the restraint period); <u>Stanfill v. Talton</u>, 851 F.Supp.2d 1346 (M.D. Ga. 2012) (finding inmate's continued restraint due to the risk of harm he posed to himself and others was proper, despite inmate's death while restrained); <u>Styron v. City of Foley</u>,  CA No. 03-0572-CG-L, 2005 U.S. Dist. LEXIS 30076, 2005 WL 3098926 (S.D. Ala. Nov. 18, 2005) (finding no constitutional violation where inmate's delay in decontamination of pepper spray posed no serious risk of harm); <u>cf.</u> <u>Nasseri v. City of Athens</u>, 373 F. App'x 15 (11th Cir. 2010) (summary judgment reversed where plaintiff was placed in unventilated patrol car, without decontamination of pepper spray, and suffered documented respiratory problems from the incident); <u>Williams v. Benjamin</u>, 77 F.3d 756 (4th Cir. 1996) (dismissal on summary judgment was not found to be proper where plaintiff was sprayed with OS spray and placed in four-point restraints, without decontamination, use of toilet, or medical attention for eight hours, *and* was forced to inhale the fumes of the spray).

The facts and evidence in the record, mainly Plaintiff's hostile behavior and history for self harm along with the fact the he sustained no lasting injury support the conclusion that there was a need for force, that Defendants' actions reasonably related the threat they perceived with the force used, and there was no risk of serious harm to Plaintiff at any time.  Given the foregoing, Defendants' actions do not shock the conscience and there was no constitutional violation on the part of Defendants Byrne, Boyington, Keers, and Rowell.  <u>See</u> <u>Warren v. Perkins</u>, CA No. 08-522-KD-C, 2009 U.S. Dist. LEXIS 80295, *17-20 (S.D. Ala. July 14, 2009) ("the objective component of an Eighth Amendment excessive force claim 'necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'") (citations omitted).

As to the liability of Defendants Boyington, Mack, or Byrne for failing to intervene or for inadequate policies, "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008). However, if excessive force is not used, then an officer has no duty to intervene. Crenshaw v. Lister, 556 F.3d 1283, 1294 (11th Cir. 2009). The court has determined there is no genuine dispute as to any material fact regarding the excessive force claim against Defendants Keers and Rowell. As a reasonable jury could not find that Defendants Keers and Rowell used excessive force on Plaintiff, no reasonable jury could find that Defendant Boyington was deliberately indifferent to a serious risk of harm to Plaintiff by failing to intervene. See Vicks v. Knight, 380 F. App'x 847, 852 (11th Cir. 2010) (finding no jury could find that an officer used force on plaintiff, so no jury could find that defendant failed to intervene). This same reasoning goes to the claims against Defendants Mack and Byrne. If no jury could find that that excessive force was used on Plaintiff, then no jury could find that Defendants Mack and Byrne are liable for policies and customs that encourage excessive force, see infra at part G, and Plaintiff presents no evidence of any custom or policy where unconstitutional uses of force are prevalent at BCSCC. See Beshers v. Harrison, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude that no constitutional violation occurred." (citations omitted)). For these reasons, summary judgment for Defendants should be granted as Plaintiff has failed to state a claim of excessive force.

C.      Claims of Due Process Violations

The Due Process Clause protects against deprivations of "life, liberty, or

property, without due process of law." U.S. Const. amend. XIV; see also Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999) (discusses liberty interests of inmates). "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). The Supreme Court has identified two situations in which a prisoner can be deprived of liberty such that the protection of due process is required: (1) there is a change in the prisoner's conditions of confinement so severe that it essentially exceeds the sentence imposed by the court; and (2) the State has consistently given a benefit to prisoners, usually through a statute or administrative policy, and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Plaintiff's allegations of due process violations do not meet the standard for determining when a protected liberty interest has been created.

1. Housing Transfers

Plaintiff claims Defendants Byrne, Mack, and Carr violated his Fourteenth Amendment rights when they transferred him or allowed him to be transferred while incarcerated at BCSCC to maximum-security custody, administrative custody, disciplinary segregation, and back to general population without due process. The law is clear, however, that inmates have no liberty interest arising directly from the Fourteenth Amendment Due Process clause in avoiding a transfer to more adverse confinement conditions. Meachum v. Fano, 427 U.S. 215, 224-25 (1976). Courts have consistently held that there is no protected liberty interest in an inmate's housing classification. The Due Process Clause does not directly protect an inmate from changes

in the conditions of his confinement, including transfers from medium to maximum

housing, as long as the condition to which the prisoner is subjected does not otherwise

violate the Constitution.  Chandler v. Baird, 926 F.2d 1057, 1060 (11th Cir. 1991) (citing

Meachum, 427 U.S. at 224; Montanye v. Haymes, 427 U.S. 236, 242 (1976)).  Thus, there

is no constitutional entitlement in being confined in the general population rather than

in the more restrictive atmosphere of maximum security or administrative confinement.

Hewitt v. Helms, 459 U.S. 460, 466 (1983); Jones v. Diamond, 594 F.2d 997, 1015 (5th Cir.

1979) (no right exists under the due process clause to a system of prisoner

classification).

The protections of the due process clause are "subject to restrictions imposed by

the practical necessities of prison life and the legitimate aims of the correctional

process." United States ex rel. Gereau v. Henderson, 526 F.2d at 895.  Among these

restrictions is that the sheriff must be able to assign cells and to separate inmates when

he deems it necessary.

> It is plain that the transfer of an inmate to less amenable and more restrictive
> quarters for nonpunitive reasons is well within the terms of confinement
> ordinarily contemplated by a prison sentence . . . it may be used to protect the
> prisoner's safety, to protect other inmates from a particular prisoner, to break
> up potentially disruptive groups of inmates, or simply to await later
> classification or transfer [citations omitted].

Jemison v. Haley, No. CV00-PT-2941-M, 2001 U.S. Dist. LEXIS 26670, 14 (N.D. Ala. Feb.

14, 2001).  It is also a well-established principal that deference is due to correction

facilities in the establishment of policies reasonably related to legitimate penological or

governmental objectives. Bell v. Wolfish, 441 U.S. 520 (1979); Procunier v. Martinez, 416

U.S. 396, 404-05 (1974); Cruz v. Beto, 405 U.S. 319, 321 (1972).

The jail transfer record shows that Plaintiff was moved from medium security

housing to maximum security housing on February 22, 2012.  Plaintiff claims his

transfer to maximum security was without due process and for a retaliatory purpose, see *infra* at part F., but there appear to be multiple, significant reasons Plaintiff was placed in a more secure, restrictive, and observable environment. Defendants state that Plaintiff was moved to high security housing after: (1) multiple suicide attempts, (2) charges of possession of contraband, (3) verbal confrontations with the nursing staff and officers, (4) threatening violence on officers while restrained.[15] (Doc. 25 at 79; Doc. 45-1 at 2-6, 8, 10, 12, 15-16, 44-47). Prior to this action being brought, Plaintiff inquired through a written grievance to Defendant Sheriff Mack as to why he was being housed in the maximum security block, and Defendant Sheriff Mack responded to Plaintiff's question in a letter dated March 6, 2012, explaining,

> [w]hile incarcerated at [BCSCC], you have threatened the life of a Corrections Officer. You have also attempted to take your own life, and have threatened to do so again. The Sheriff's Office will take all steps to ensure the safety of its Officers and your personal safety. In order to do this, your classification will be reviewed from time to time based upon your conduct towards others in the facility and towards yourself.

(Doc. 25 at 86). This letter, further supported by the affidavits of Defendants, articulates sufficient reasons for placing Plaintiff in a higher security housing unit. Furthermore, Plaintiff provides no evidence only conclusory allegations that his transfer to maximum security housing was due to retaliation; Defendants on the other hand have submitted evidence in the form of affidavits and jail records detailing rational reasons and penelogical justifications for transferring Plaintiff to the more monitored maximum security block. Additionally, the classification of an inmate involves the

---

[15]     Although Plaintiff denies ever threatening violence on an officer, such a statement is documented in an activity report and the transfer report that Jacoby had previously threated violence on officers. (See Doc. 43-2 at 2; Doc. 25 at 4, 35; Doc. 45-1 at 47-48). While being held in a restraint chair on February 8, 2012, Plaintiff threatened, "to make a shank and kill some officers." (Doc. 45-1 at 48).

daily workings and security of the jail is a decision that should be made by the officers

physically present, not by the Court in hindsight. An officer's judgment is given great

deference when making decisions that focus on safety and the "appropriate level of

force" to be used. <u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001).

The deprivations Plaintiff alleges that are found in maximum security housing

and in segregated housing, do not present any "significant hardship" imposed on

Plaintiff due to any of these transfers (including those to maximum security, protective

custody, and segregation) that can be deemed "atypical . . . in relation to the ordinary

incidents of prisoner life." <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995) (concluding thirty

days of disciplinary segregation did not give rise to a protected liberty interest);

<u>Rodgers v. Singletary</u>, 142 F.3d 1252, 1253 (11th Cir. 1998) (concluding two months in

administrative confinement did not constitute deprivation of a protected liberty

interest); <u>see also</u> <u>Meachum</u>, 427 U.S. at 223-25 (concluding no liberty interest in

discretionary transfer to a maximum security state prison); cf. <u>Magluta v. Samples</u>, 375

F.3d 1269, 1275-76, 1282 (11th Cir. 2004) (concluding pretrial detainee's detailed

allegations, if true, established a liberty interest where pretrial detainee, *unlike other*

*pretrial detainees or even convicted prisoners*, was placed in administrative detention in

conditions that constituted solitary confinement, including being locked in a closet-

sized cell with minimal contact with human beings for over 500 days). Plaintiff does

not identify any extreme differing conditions[16] or lengthy duration of custody that

would give rise to a constitutional violation, nor will any of the transfers affect the

duration of his (potential) sentence. <u>Ramirez v. Galaza</u>, 334 F.3d 850, 861 (9th Cir. 2003).

---

[16]    Plaintiff identifies the *fear* of physical danger in maximum security but fails to
identify an actual threat or harm. Moreover, Plaintiff fails to allege or support that
Defendants had any knowledge of an actual threat of harm to Plaintiff.

Therefore, the Court finds no protected liberty interest at issue that would necessitate defendants holding a hearing prior to transferring Plaintiff and, therefore, no Fourteenth Amendment violations.

### 2.     Disciplinary Hearings

Plaintiff claims the policies and customs regulating the disciplinary hearings at BCSCC, for which Defendants Mack and Byrne are responsible, violate the due process clause of the Fourteenth Amendment. (Doc. 1 at 16-17). Plaintiff's support of this allegation is that while incarcerated at BCSCC he was denied: 24-hour notice of disciplinary hearings,[17] written reports of the charges against him, an opportunity to prepare a defense, an impartial hearing or appeals boards, and recordings of the hearings necessary for appeal purposes. (Doc. 1 at 7-9, 16-17).

For each of the disciplinary hearings at issue, Plaintiff faced at most the possibility of disciplinary segregation for the charges brought against him. This type of temporary confinement does not give rise to a constitutionally protected liberty interest. See Hall v. Holt, CA 92-0013-RV-M, 1995 U.S. Dist. LEXIS 20346, at *135 (S.D. Ala. June 12, 1995) (quoting Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993)). The Supreme Court has held that disciplinary segregation is not a "dramatic departure" from the ordinary conditions of confinement for an inmate; therefore, temporary confinement in

---

[17] It is not accurate to claim, as Plaintiff does, that he did not receive notice of his disciplinary hearings. Plaintiff was presented with at least 24-hour notice of all his hearings and the charges were identified on the notices. "The fact that these notices were not in Plaintiff's preferred form does not amount to a deprivation of any due process rights, particularly considering that Plaintiff has not, and could not, claim that he did not know the charges against him." (Doc. 43 at 34). Given that the Court has determine Plaintiff had no liberty interest stake, the issue of whether or not Plaintiff should have received copies of his disciplinary reports need not be addressed by the Court.

disciplinary segregation alone does not require the due process procedures delineated in <u>Wolff</u>, as argued by Plaintiff (doc. 51 at 25). <u>Sandin v. Conner</u>, 515 U.S. 472, 485 (1995); <u>see</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539, 559 (1974) (describing the procedural rights required by due process including written notice of violations, evidence against one, opportunity to be heard and present witnesses, a neutral hearing body, etc.); <u>see also</u> <u>Rodgers v. Singletary</u>, 142 F.3d 1252, 1253 (11th Cir. 1998) (affirming two months in administrative segregation was not a constitutionally protected liberty interest requiring the protection of due process); <u>cf</u>. <u>Williams v. Fountain</u>, 77 F.3d 372, 374 n.3 (11th Cir. 1996) (finding that twelve months of solitary confinement was an atypical hardship on inmate and created a liberty interest entitled to due process protection).

Plaintiff claims due process violations related to four disciplinary charges: 1) possession of contraband tobacco, 2) possession of a weapon, 3) unauthorized writing, 4) making false statements. For the charge of possession of tobacco, Plaintiff admitted possession of the contraband and received 14 days in segregation.[18] (Doc. 25 at 74). For the charge for possession of a weapon, he was found not guilty "by hearing board and

_____

[18]    Plaintiff alleges there are "errors and inconsistencies in the [disciplinary reports and hearings] paperwork" that would invalidate them. (Doc. 25 at 6-7). However, each complaint appears to be easily explainable or irrelevant. Plaintiff contends that the hearing date written on his notice was inconsistent. He states "April 7th" and "April 14th" are listed as the hearing date on his hearing notice. (<u>Id</u>.). Also, he alleges the notice was signed by the arresting officer on April 7th but notarized on April 9th. (<u>Id</u>.). After an examination of the document, the court finds where the 7th is listed as the hearing date, it is "crossed out" and initialed as a mistake by Officer Quinley. (<u>See</u> Doc. 25 at 74). And, the court sees a single date listed in the notarization portion of the document. It appears Officer Quinley signed the document and it is dated and notarized under his signature. Therefore, whether it is dated the 7th or 9th (and it is illegible to the court) is irrelevant as there is only one dated signature; Officer Quinley simply signed the notice and it is notarized under his signature. (<u>Id</u>.).

based on officer statement [that] inmate turned shank into Private Aldrete."[19]  (Id. at 77).

For the charge of an unauthorized writing, he was found not guilty.  (Id. at 82).  For the

charge of making false statements, Plaintiff was found guilty and required to spend 12

days in segregation. (Id.).   The disciplinary hearings for which Plaintiff complains all

resulted in no confinement change or short durations in disciplinary segregation.  These

two brief sentences in segregation do not amount to a significant hardship and are not

considered a dramatic departure from ordinary conditions of confinement.  Therefore,

the court concludes that no liberty interest exists that would give rise to a constitutional

due process protection under these circumstances, and summary judgment should be

granted for Defendants.

D.     Deliberate Indifference to Safety

Plaintiff alleges Defendants Byrne and Carr failed to protect him and were

deliberately indifferent to his safety by placing him in maximum-security housing

where violent inmates are held.  (Do.c 1 at 23-24).  The Eighth Amendment protects

inmates from officials' deliberate indifference to inmate attacks and sexual assaults.

Jones v. Diamond, 594 F.2d 997, 1017 (5th Cir. 1979). The Eighth Amendment is only

violated by "[a] prison official's 'deliberate indifference' to a substantial risk of serious

---

[19]     Plaintiff asserts he spoke to Defendant Boyington regarding turning over the
shank on April 13, 2012, and that Officer Aldrete called him over the intercom to
retrieve the shank. (Doc. 25 at 79).  Defendants' records indicate that Officer Aldrete
and Defendant Rowell were the officers who received the shank.  (Doc. 46-1 at 28).
However, this dispute too is irrelevant to the action.  Plaintiff was placed in segregation
based on the administration's enforcement of its new rule to curtail manipulation from
Plaintiff for harboring contraband and turning it over to officers in exchange for
leniency in disciplinary sentencing.  However, Plaintiff was found not guilt of
possessing a weapon at the hearing.  Therefore, it is immaterial as to which officer
received the weapon and which officers were on the hearing board as Plaintiff was not
prejudiced and suffered no harm.

harm to an inmate[.]" <u>Farmer</u>, 511 U.S. at 828.  This standard requires that the alleged

deprivation be, objectively, "sufficiently serious." <u>Id</u>. at 834, 114 S. Ct. at 1977 (quoting

Wilson v. Seiter, 501 U.S. 294, 298 (1991); citations omitted), and "the denial of 'the

minimal civilized measure of life's necessities[.]'" <u>Id</u>. (quoting <u>Rhodes v. Chapman</u>, 452

U.S. 337, 347 (1981)).

Plaintiff contends Defendants failed to protect him from verbal, physical, and

sexual abuse in the maximum-security block.  Specifically, he states Defendants "have

heard him complain of being sexually assaulted, verbally assaulted, physically

assaulted but ignored his plea."  (Doc. 1 at 24).

Since Plaintiff complains about being attacked by other inmates, he must

establish that the conditions under which he was incarcerated presented "a substantial

risk of serious harm." <u>Rhodes,</u> 452 U.S. at 347 (citation omitted).   Therefore, Plaintiff

must prove, Defendants knew of a substantial risk of serious harm to Plaintiff's health

or safety and were deliberately indifferent to the risk.  <u>Id</u>. at 837.   Furthermore, even if

prison officials knew of a substantial risk of serious harm, they may be exonerated from

liability,

> if they responded reasonably to the risk, even if the harm ultimately was
> not averted. A prison official's duty under the Eighth Amendment is to
> ensure "reasonable safety," (citations omitted), a standard that
> incorporates due regard for prison officials' "unenviable task of keeping
> dangerous men in safe custody under humane conditions." (citations
> omitted) Whether one puts it in terms of duty or deliberate indifference,
> prison officials who act reasonably cannot be found liable under the Cruel
> and Unusual Punishments Clause.

<u>Id</u>. at 844-45.

Plaintiff claims that he was sexually harassed from February 22, 2012 through

May 24, 2012, by two named inmates who would  "walk around with an erection all the

time in the Block laughing about it and siting [sic] on Jacoby's bed."   (Doc. 25 at 13).

He also states he "was in several fights over food and guys jacking off in the windows." (Id.). Plaintiff contends he notified Defendants through grievances and letters that he was being harassed sexually, physically, verbally and yet no actions were taken (specifically, he was not transferred back to medium custody nor were cameras installed) until after he was assaulted by two inmates.[20] (Doc. 25 at 26). However, the Court finds no evidence of Defendants Byrne and Carr (or any other defendant 's) knowledge of a risk of harm to Plaintiff prior to the alleged assault on May 23, 2012; and, knowledge of a substantial risk of serious harm is an essential element required to succeed on Plaintiff's claim.[21]

The record reflects Plaintiff wrote Defendant Mack on May 7, 2012 complaining of the violence, lack of officers in the maximum-security unit, and the lack of surveillance cameras. (See Doc. 25 at 86-89). Defendant Mack forwarded this letter to Defendant Byrne asking that the complaints be investigated further. (Id.). This

---

[20] Plaintiff also claims that defendants were deliberately indifferent to his safety by only having one officer guard the high max block, and he insists he would not have been subjected to pepper spray and restrained in a chair had there been video cameras in the unit. (Doc. 1 at 24). The Court finds no merit to these claims. Alabama sheriffs have the duty and authority to operate the jails and the discretion to spend its funds as they see necessary. Turquitt v. Jefferson Cnty, Ala., 137 F.3d 1285, 1290-91 (11th Cir. 1998). Also, the incident of Plaintiff being sprayed with OC spray and placed in a restraint chair was recorded on video camera. (Doc. 45-14 at 19-20). Therefore, Plaintiff's argument is made contrary to the facts of the action.

[21] Plaintiff enhances his allegation that Defendants were deliberately indifferent to his safety by declaring he is bisexual and contending that Defendants knew this fact. However, Defendants deny having knowledge of Plaintiff's bisexuality that would risk his safety. (Doc. 43-2 at 3). The court does not find that this is a genuine dispute because Plaintiff himself belies this claim with his declaration in a grievance that he is not gay or bisexual. (Doc. 44-1 at 22). The grievance is dated April 19, 2012 and it addresses a sexual harassment dispute that is not before the court, but Plaintiff states, "I'M NOT GAY OR BI and I Don't Like Dick." Therefore, the court finds no evidence that Defendants knew of a heightened risk of harm to Plaintiff and disregarded it based on his sexual orientation.

communication trail demonstrates that neither Defendant Mack nor Byrne ignored Plaintiff's complaints; rather they took action, inquired into the situation and attempted to remedy it.  Subsequent to this letter, and after Plaintiff's alleged May 23, 2012 assault, another guard and extra cameras were placed in the unit.  (Doc. 51 at 22).  Defendants acted reasonably under the situation and were not deliberate indifferent to Plaintiff simply because they did not immediately transfer him to medium custody as he desired.  (Id.).

On May 14, 2012, Plaintiff filed two grievances requesting to be moved to medium security; he stated, "I honestly don't deserve the treatment I'm getting right now and want to be moved.  People know I have been talking to you [officers] and are calling me a snitch.  Please move me back to medium [custody]."  (Doc. 25 at 90).  He also detailed that he "was having a hard time" "be[ing] housed with violent and sexual offenders. . . . [He] keep[s] being told to relax, behave and [he'll] be moved."  (Id. at 91).  In response to these grievances, Plaintiff was told if he was "having problem[s] let the officers know" and that Plaintiff could be moved to another block, but he would not be transferred to medium custody "at this time."  (Doc. 25 at 90).  While these filed grievances inform Defendants that Plaintiff is unhappy in maximum custody and desired to be moved to medium custody, the writings do not in any way put Defendants on notice that Plaintiff is at any risk of serious harm or danger from another inmate.  Furthermore, each grievance was responded to and insisted that Plaintiff notify an officer if Plaintiff was having any problems.  This negates any claim of deliberate indifference on the part of Defendants.

On May 23, 2012, *after* the alleged assault on Plaintiff, Defendants received the *first* grievance where they learn of an injury or an actual risk of injury to Plaintiff.  (Id. at

99-100). Plaintiff details the alleged assault from earlier that morning and requests that he be moved to medium custody where he has no enemies and others are not aware that he reported an inmate assault or turned in a weapon belonging to the alleged assailants' three to four weeks prior to the incident. (Id.). The grievance is answered with a response stating, "[y]our classification will not be changed at this time, but we will find a cell in an area where you are safe from your known enemies." (Id.). This grievance is the first evidence, notice, or proof that Defendants received regarding a serious risk to Plaintiff's safety. There is no evidence that Defendants had any prior knowledge of a serious risk of harm to Plaintiff, and Plaintiff has not responded with any supplemental documents that would challenge or dispute the record submitted by Defendants.

Therefore, what is evidenced in the record before the court is that immediately following the alleged attack on May 23, 2012, the two inmate attackers were charged with assault[22] and Plaintiff was moved to protective custody.[23] It appears that defendants, once they had knowledge of harm to Plaintiff, acted swiftly to keep him safe. Also, at least one guard and extra surveillance cameras were added to the unit. (Doc. 25 at 86-89; Doc. 50 at 10, 20). Therefore, Plaintiff fails to prove an essential

---

[22] The alleged inmate assailants were later found not guilty for the attack due to a lack of evidence. Specifically, there were affidavits from other inmates, doc. 45-1 at 35-37, 39, 41, and from two officers, id. at 33; doc. 43-4 at 3, stating that alibis existed for the charged inmates at the time of the attack and/or that they witnessed Plaintiff self-inflict the wounds.

[23] Apparently, however, it is not safety and security that Plaintiff sought, rather getting his way and returning to medium custody because the next two grievances filed by Plaintiff detail his objections to being housed in administrative segregation for his protection. (See Doc. 25 at 101, 103). On May 28 and 30, 2012, Plaintiff complains of being held in protective custody after the alleged inmate assaults. (Id.). Both times, Defendant Byrne responded that Jacoby's housing classification would be evaluated within the week. (Id.).

element of his claim, and it should be dismissed.

E.      Deprivation of Life's Basic Necessities

At all times while Plaintiff was housed in segregation he claims he was denied visits, television, books, space to walk and exercise, grooming and hygiene products, access to materials to write letters or legal documents; he asserts that he was not allowed outside recreation and only allowed 30 minutes of indoor recreation a day, and he further states his "2-man" segregation cell housed three or four inmates which forced him to sleep on the floor beside the toilet where urine would sometimes "splatter" on his sheets. (Doc. 1 at 9-10; Doc. 25 at 24-25).  Plaintiff claims he suffered mentally and physically from these housing restrictions and conditions and that such denials "psychologically torture[d]" him and "deprive[d] him of the things and rights."  (Doc. 1 at 10).

In analyzing confinement conditions about which a pretrial detainee complains, a court must decide whether the restriction was imposed for a punitive purpose or whether it is reasonably incidental to a legitimate government objective.  See Bell v. Wolfish, 441 U.S. 520, 538-39 (1979).  "If a restriction is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court may infer that the purpose of the government action is punishment." Lynch v. Baxley, 744 F.2d 1452, 1463 (11th Cir. 1984).

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however…. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

Bell, 441 at 537.  Also, pretrial detainee complaints are evaluated against the totality of confinement conditions to determine if there is constitutional deficiency.  See Hamm v.

DeKalb County, 774 F.2d 1567, 1575-76 (11th Cir. 1985).

Although the Constitution prohibits cruel and unusual punishment, "the Constitution does not mandate comfortable prisons, Rhodes v. Chapman, 452 U.S. 337, 349 (1981), but neither does it permit inhumane ones …." Farmer, 511 U.S. at 832. "Prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To prevail Plaintiff must prove that he suffered "extreme deprivations" denying him "the minimal civilized measure of life's necessities," Hudson v. McMillian, 112 S. Ct. 995, 1000 (1992); Wilson v. Seiter, 501 U.S. 294 (1991); LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993), and that defendants were deliberately indifferent to his basic needs. Wilson, 111 S. Ct. at 2327; LaMarca, 995 F.2d at 1535; See Hernandez v. Velasquez, 522 F.3d 556, 561-562 (5th Cir. 2008) (8th Amendment not violated when inmate denied outdoor exercise during 13-month period under lockdown because inmate failed to demonstrate that prison officials ignored his requests for medical attention); Harden-Bey v. Rutter, 524 F.3d 789, 795-96 (6th Cir. 2008) (8th Amendment not violated when inmate placed in administrative segregation because inmate failed to show deprivation of minimum necessities, and "routine discomfort" part of penalty criminal offenders pay); Trammell v. Keane, 338 F.3d 155, 163-65 (2d Cir. 2003) (8th Amendment not violated when inmate deprived of clothing, blanket, and mattress for several weeks and toilet paper for more than week as disciplinary measure because discomfort of lacking clothing and bedding did not risk inmate's health and safety); Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003) (8th Amendment not violated when inmate denied contact visitation and religious services for 37 days because no deprivation of life necessities involved); Shakka v.

32

Smith, 71 F.3d 162, 168 (4th Cir. 1995) (8th Amendment not violated by refusal to allow prisoner to shower for 3 days after human excrement was thrown on him because prisoner was given materials to clean himself and his cell); cf. Chandler v. Baird, 926 F.2d 1057 (11th Cir. 1991) (see below); Gee v. Estes, 829 F.2d 1005, 1006 (10th Cir. 1987) (constitutional violation where prisoner was placed naked in a lice-infected cell, was deprived of blankets where temperature was below forty degrees, was denied food or served dirty food, and was left with his head in excrement while having a seizure).

The Eleventh Circuit has held a constitutional violation of housing conditions where inmates suffer extreme deprivations. In Chandler, the plaintiff complained that he was confined:

> In a cold cell with no clothes except undershorts and with a plastic covered mattress without bedding; filth on the cell's floor and walls; deprivation of toilet paper for three days; deprivation of running water for two days, lacks of soap, toothbrush, toothpaste, and linen; and the earlier occupancy of the cell by an inmate afflicted with an HIV virus . . . the temperature was as low as 60 degrees, that it was 'ice cold', that [Chandler] slept on the floor and on occasion huddled with a roommate, sleeping between two mattresses.

Chandler, 926 F.2d at 1063.

In order to prevail on his Eighth Amendment claim, Plaintiff must establish the conditions under which he was incarcerated presented a "substantial risk of serious harm," Farmer v. Brennan, 511 U.S. 825, 832 (1994), and Defendants were deliberately indifferent. Plaintiff, however, fails to meet this standard.

Plaintiff complains that while housed in the segregation unit, his personal property was removed, including law books, food, shampoo, soap, toothpaste, lotion, and other grooming materials available through the commissary; however, Plaintiff admits, as per BCSCC policy, he was given a one-ounce bar of soap and a travel size

toothpaste and allowed to purchase two stamps, one pad of paper, and one pen per week.  (Doc. 25 at 11).  The court finds that life's basic necessities were provided for Plaintiff, including food, shelter and hygiene products.  While the articles provided to Plaintiff may not have been to the liking or standard Plaintiff desired, neither his health nor safety was affected.   It should also be noted that the denial of law books and the restrictions on writing while housed in segregation did not affect Plaintiff's ability to pursue multiple legal actions.  While incarcerated at BCSCC, Plaintiff has successfully filed four lawsuits in the United States District Court for the Southern District of Alabama, including this current action (see case numbers 12-cv-00197-WS-M; 12-cv-00366-CG-C; 12-cv-00640-CG-N; 13-00070-KD-B) and filed at least 13 pleadings or motions in this action alone.  The court is therefore hard-pressed to find that the restrictions of segregation equated to conditions that could be viewed as punishment or inhumane.  Taking Plaintiff's allegations as true, there is not been an "extreme" deprivation of life's basic necessities evidenced nor a risk of serious harm in this action.

Even the less than sanitary sleeping arrangement asserted by Plaintiff does not rise to the level of being unconstitutional.  An inmate demonstrates that the conditions of his confinement violate constitutional rights by showing the alleged deprivation is "objectively, sufficiently serious," resulting "in the denial of the minimal civilized measures of life's necessities," and that prison officials were deliberately indifferent to an excessive risk to inmates health or safety.  Farmer, 511 U.S. at 834 (internal citations and quotations omitted).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of conferment unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and

34

unusual "conditions"; it outlaws cruel and unusual "punishments."

Id. at 837. Plaintiff has not alleged any excessive risk to his health or safety presented by sleeping on the floor "next to toilets with urine splattering on his mattress and sleep[ing] in pubic hairs, dirt and bugs." (Doc. 25 at 11). And, neither does Plaintiff allege that he notified Defendants of any risk or danger to himself from his housing arrangement. Additionally, the court finds no evidence that Defendants had subjective knowledge of any excessive risk to Plaintiff's health or safety while housed in segregation, nor is there evidence of any objective risk of which Defendants reasonably should have been aware. While this episode would surely be uncomfortable and unsettling, it lacks sufficiently pleaded allegations of deprivations of life's necessities and risk of harm (i.e., Plaintiff was not denied bedding and does not give any specifics as to the duration of sleeping under the toilet; he does not mention the inability to sleep because of a urine soaked mattress; he does not allege that the smell was so intense that it would parallel an unsanitary condition; nor does Plaintiff allege that he was placed under the toilet for malicious or sadistic reasons.). Furthermore, Plaintiff does not state that he suffered any physical injury due to the housing conditions. See Rhodes v. Chapman, 452 U.S. 337, 346 (1981) ("[T]he Constitution does not mandate comfortable prisons."); compare Fischer v. Ellegood, 238 F. App'x 428, 434 (11th Cir. 2007) (No Eighth Amendment violation found where sleeping on the floor or on unwashed bed linens or being denied showers amounted a deprivation of essential sanitation) , with McCord v. Maggio, 927 F.2d 844, 846-47 (5th Cir. 1991) (Eighth Amendment violation where plaintiff was forced repeatedly over a 10-month period to sleep on a mattress placed on the floor that was often flooded with sewage and foul water). Plaintiff fails to present any evidence that he suffered an extreme deprivation of any kind, nor that

35

Defendants were deliberately indifferent to his safety.  As such, the court finds no constitutional violation regarding the conditions of Plaintiff's confinement, and Defendants should be granted summary judgment.

F.      Retaliation

Plaintiff claims Defendants Carr and Byrne retaliated against him by his housing classifications.[24]  However, a "restriction of pretrial detention [that] is reasonably related to a legitimate government objective, it does not, without more, amount to 'punishment.'"  Bell v. Wolfish, 441 U.S. 520, 539 (1979).  "Because the mere act of classification 'does not amount to an infliction of pain,'" the Eighth Amendment does not prohibit inmate classification.  Myron v. Terhune, 476 F.3d 716, 719 (9th Cir. 2007) (quoting Hoptowit v. Ray, 682 F.2d 1237, 1251 (9th Cir. 1982)).  Furthermore, as

---

[24]      Plaintiff also claims he was retaliated against, while housed in segregation, by being denied visits from his mother, which is standard policy at BCSCC, and that he was restricted from writing his sister while she was simultaneously incarcerated at BCSCC.  (Doc. 1 at 22).  However, this restriction is not due necessarily to his housing unit, rather standard policy of BCSCC.  Furthermore, Sheriff Mack previously, through written correspondence, explained why Plaintiff could not write his sister.  The Sheriff informed Plaintiff that he would need documented proof of his familiar relationship before his communication request would be allowed.  (Doc. 25 at 86).  Neither of these claims establishes retaliation under the Eighth Amendment as they are standard policies of BCSCC, not retaliation for Plaintiff exercising his First Amendment right. Plaintiff fails to connect any constitutional right to his denial of visits or ability to write his sister.  Therefore, Plaintiff fails to state a valid claim.

Plaintiff also alleges being held in the restraint chair was a retaliatory action on the part of Defendants Keers, Rowell, and Boyington.  He supports this claim by stating that while he was restrained in the chair he was laughed at and told to, "burn bitch," and someone else yelled out, "sue me now punk."  (Doc. 1 at 7) (emphasis omitted). While this is admittedly inappropriate and unprofessional, it is not evidence that Plaintiff was restrained with the intent of causing him harm or for malicious reasons. See Perdue v. Union City, CA No. 1:05-CV-00753-MHS, 2006 U.S. Dist. LEXIS 60825, 2006 WL 2523094 (N.D. Ga. Aug. 28, 2006) (conduct did not rise to "shock the conscience" in excessive force claim even where officer placed plaintiff in restraint chair, sprayed pepper spray on the straps, and stated she would "kick [plaintiff's] teeth out and referred to plaintiff as a "black bitch.").

discussed *supra*, prisoners have no liberty interest arising directly from the Fourteenth Amendment Due Process clause in avoiding a transfer to more adverse confinement conditions, <u>Meachum v. Fano</u>, 427 U.S. 215, 224-25 (1976); <u>Anderson v. County of Kern</u>, 45 F.3d 1310, 1315 (9th Cir. 1995) ("[T]here is no liberty interest in remaining in the general population.").

To succeed on a claim for retaliation under § 1983, Plaintiff

> must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. <u>McDonald v. Steward</u>, 132 F.3d 225, 231 (5th Cir. 1998). The inmate must allege more than his personal belief that he is the victim of retaliation. <u>Johnson v. Rodriguez</u>, 110 F.3d 299, 310 (5th Cir.) <u>cert</u>. <u>denied</u>, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997). Mere conclusionary allegations of retaliation will not be enough to withstand a proper motion for dismissal of the claim. <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995). 'The inmate must produce direct evidence of motivation or, the more probable scenario, "allege a chronology of events from which retaliation may plausibly be inferred."' <u>Id</u>. (citation omitted).

<u>Jones v. Greninger</u>, 188 F.3d 322, 324-25 (5th Cir. 1999).

Plaintiff states Defendants Byrne and Carr "had enough of Jacoby's Grievances, letters and his lawsuit so they put him in High Max for punitive reasons."[25] (Doc. 25 at 5). However, Plaintiff fails to identify and connect any specific letter, grievance, or any communication protected by the First Amendment to this allegation of retaliation by defendants. He does not even denote a dated timeline of the events that could be used to chronologically infer retaliation. There are no direct links or identified causal

---

[25] Plaintiff also claims his was transferred to maximum security housing solely for punitive reasons due to his refusing his medications. This claim has previously been heard by this court in <u>Jacoby v. Baldwin County</u>, CA No. 12-0197, WS-M, 2013 U.S. Dist. LEXIS 72212 (S.D. Ala. May 7, 2013), where we found no retaliatory or punitive reasons for Plaintiff's transfer after refusing to take his medications, nor any constitutional violation in the transfer.

connections to Plaintiff's "complaints" of the BCSCC or its officers that indicate retaliation. While courts liberally construe the complaints of *pro se* plaintiffs, they are not at liberty to rewrite the complaint to state a claim. <u>Trawinski v. United Technologies</u>, 313 F.3d 1295, 1297 (11th Cir. 2002) (*Pro se* complaints must be held to less stringent standards than formal pleadings drafted by lawyers.); <u>GRJ Inv., Inc. v. Cnty. of Escambia, Fla.</u>, 132 F.3d 1359, 1369 (11th Cir. 1998) (The leniency to which *pro se* plaintiffs are entitled "does not give a court license to serve as *de facto* counsel for a party . . . or to rewrite an otherwise deficient pleading in order to sustain an action."). Therefore, without Plaintiff connecting Defendants' actions to a protected constitutional right, Plaintiff's claims are nothing more than "mere conclusionary allegations" and are not sufficient to state a claim of retaliation. <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995). Thus, Plaintiff's retaliation claim should be dismissed.

G.     <u>Failure to Train and Supervise</u>

Plaintiff claims Defendants Mack and Byrne are responsible as supervisors for instituting the policies and customs at BCSCC that allow for unconstitutional acts and violations to occur. (Doc. 1 at 15-19). In order to state a claim for failure to train or supervise upon which relief can be granted in a § 1983 action, Plaintiff must establish a causal connection between each defendant's actions, orders, customs, policies, or breaches of statutory duty and the alleged deprivation of his constitutional rights. <u>See Frankum v. Chapman</u>, 2009 WL 1118875, *3 (S.D. Ala. 2009); <u>Trotter v. Correctional Medical Services, Inc.</u>, 2008 WL 2225696, *9 (S.D. Ala. 2008). Liability for an alleged constitutional violation cannot be established on the basis of a theory of *respondeat superior*. <u>See Edwards v. Alabama Dep't of Corrs.</u>, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support their § 1983 claim. . .

.").  "[S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

"The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Id. (citations omitted). "Alternatively, the causal connection may be established when a supervisor's 'custom or policy . . . result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" Id. (citations and internal quotation marks omitted).  In such instances, Plaintiff must show that the policy or custom was "the 'moving force [behind] the constitutional violation.'" Pinkney v. Davis, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted).  "[I]t is clear that not only must there be some degree of 'fault' on the part of [defendant] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." Id. (citations omitted). Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." Tittle v. Jefferson Cnty. Comm'n, 10 F.3d 1535, 1542 (11th Cir. 1994).

Plaintiff alleges it is the policy and custom of Defendants Mack and Byrne to allow officers to conduct disciplinary hearings who where also witnesses to the infraction at issue, to allow excessive uses of force by frequent deployment of OC spray followed by long periods of restraint without decontamination, and that Defendant

Byrne authorizes the initial hearings and any appeals of the same. (Doc. 1 at 16-17, 24). As discussed above, the housing classifications, disciplinary hearings, sentences imposed, and appeals complained of in this action do not give rise to any due process protections, see supra at part III.C.; therefore, Plaintiff has failed to state a claim in violation of the Fourteenth Amendment. The allegations of excessive force put forth in this action do not meet the elements of an Eighth Amendment violation as the force used by Defendants Keers and Rowell was applied in a good faith effort to maintain or restore discipline, not to cause harm, see supra part III.B. Given that Plaintiff has failed to prove a single constitutional violation on the part of any defendant for any of his claims, Defendants Mack and Byrne cannot be held liable for failing to train or supervise because it is well-settled that a supervisor cannot be held individually liable under § 1983 absent a finding that a subordinate officer is liable for inflicting constitutional injuries. Howell v. City of Lithonia, 397 F. App'x 618, 621 (11th Cir. 2010) ("Because [the arresting officer] committed no constitutional violation, [the plaintiff] cannot show a basis on which to establish municipal liability against the [c]ity or supervisory liability against [the police chief]."); Beshers v. Harrison, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude that no constitutional violation occurred." (citations omitted)); Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999) (granting summary judgment for a prison warden and a psychiatrist on § 1983 supervisory liability claims as there was no evidence of an underlying constitutional violation by a mental health professional). Because the individual actions of Defendants Keers, Rowell, Boyington, and Carr did not violate Plaintiff's constitutional rights, Defendants Mack and Byrne cannot be individually liable under § 1983 in their supervisory

capacity, and Defendants Mack and Byrne are entitled to summary judgment.

## IV. Conclusion.

Based upon the foregoing reasons,[26] it is recommended that that Plaintiff's

---

[26]     In the alternative to dismissal of this action for the reasons stated above, this action is due to be dismissed pursuant 42 U.S.C. § 1997e(e). Section 1997e(e) states that "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

In this action, Plaintiff seeks injunctive relief to discontinue the unconstitutional practices alleged in his complaint, as well as compensatory, punitive, and nominal damages for his injuries, including psychological abuse and pain. (Doc. 1 at 28; Doc. 25 at 29; Doc. 51 at 24). Any injunctive relief is moot because Plaintiff has been transferred from BCSCC to Ventress Correctional Facility. (See doc. 65); see also, Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988), cert. denied, 488 U.S. 1046 (1989) ("Absent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred." (quotation omitted)).

Furthermore, Plaintiff seeks monetary damages for mental stress or "psychological abuse and pain." (Doc. 1 at 28). Pursuant to § 1997e(e), Plaintiff may not recover compensatory or punitive damages without a showing of actual injury, and his complaint fails to allege any suffered injury considered more than de minimus. Plaintiff alleges two physical injuries in this action: 1) a cut on his cheek and arm from the alleged May 23, 2012 inmate assault (that was never proven to have occurred based on the affidavits of inmates and officers), and 2) burning from the pepper spray that was used on him on April 13, 2012. These injuries are not serious injuries and can only be considered de minimus when attempting to establish an Eighth Amendment cause of action. Warren v. Perkins, CA No. 08-522-KD-C, 2009 U.S. Dist. LEXIS 80295, *17-20 (S.D. Ala. July 14, 2009) ("the objective component of an Eighth Amendment excessive force claim 'necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'") (citations omitted). Therefore, plaintiff cannot recover compensatory and punitive damages on this claims as 42 U.S.C. §1997e(e) bars them.

Therefore, Plaintiff would only potentially be able to recover nominal damages for his claims, if he were successful. See Carey v. Piphus, 435 U.S. 247, 266-67 (1978) (holding if plaintiffs were entitled to nominal damages for the violation, the damages should not exceed one dollar); Kyle v. Patterson, 196 F.3d 695, 697 (7th Cir. 1999) ("[N]ominal damages, of which $1 is the norm, are an appropriate means of vindicating rights whose deprivation has not caused actual, provable injury.").

Therefore, Plaintiff's action would be subject to dismissal pursuant to 42 U.S.C. § 1997e(e), and only Plaintiff's claim for nominal damages, typically in the amount of one

motion for summary judgment be **denied;** Defendants' motion for summary judgment be **granted**; and that this action be **dismissed with prejudice**.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(B); S.D. ALA. L.R.72.4. The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's *factual findings*." Dupree v. Warden, Attorney Gen., State of Ala., 715 F.3d 1295, 1300 (11th Cir. 2011). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE this 18th day of March, 2014.

s/WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE

---

dollar, would proceed if he could produce evidence of a constitutional violation.